IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


GLENN A. COLEMAN                                                                    PLAINTIFF

V.                                              NO. 09-5129

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration                      DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Glenn A. Coleman, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), rendering a partially favorable decision on his claims for a period of disability and disability insurance benefits under Title II of the Social Security Act (the Act), and Supplemental Security Income under Title XVI of the Act.  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and supplemental security income on February 24, 2004, alleging disability since November 7, 2001.  (Tr. 99).  Plaintiff's applications were denied initially and on reconsideration.  (Tr.36-37, 53-54, 38-39, 60-62 ).  Pursuant to Plaintiff's request, a hearing before an Administrative Law Judge (ALJ) was held on January 10, 2006, at which Plaintiff, Plaintiff's mother and a Vocational Expert (VE) testified.  (Tr. 502-552).  Subsequent to the hearing,  the ALJ requested and received reports from additional Clinical Psychologists and an

-1-

Orthopedist regarding Plaintiff's mental and physical limitations.  (Tr. 286-291, 297-300, 301-303, 304-309, 487-493, 494-496, 498-501).   A supplemental hearing was held on November 7, 2006, before the ALJ at which Plaintiff, Plaintiff's mother, and a VE testified.  (Tr. 553-569).  On December 18, 2006, the ALJ issued an unfavorable decision.  (Tr. 40-52).  While Plaintiff's first application was on appeal, he again filed claims for a period of disability and disability insurance benefits and supplemental security income on January 27, 2007.  (Tr. 103-104).  On May 5, 2007, the Appeals Council remanded the case to the ALJ for further proceedings.  (Tr. 89-93).

On September 16, 2008, another hearing was held before the ALJ, who merged Plaintiff's two applications.  (Tr. 572).  On October 1, 2008, the ALJ entered his decision, finding that Plaintiff was not disabled through December 31, 2006, the date last insured, but that Plaintiff had been disabled beginning on July 24, 2007.  (Tr. 30).  The effect of this finding was to eliminate the Plaintiff's disability insurance claim and any supplemental security benefits prior to July 24, 2007.  The Appeals Council denied Plaintiff's request for review on May 1, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner.  (Tr. 3-5).

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 7, 2001, the alleged onset date.  (Tr. 20).  He further found that Plaintiff had the following severe impairments: osteoarthritis in the cervical spine and depression.  However, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20-21).  After careful consideration of the entire record, the ALJ found that

-2-

Plaintiff had the residual functional capacity (RFC) to perform a wide range of sedentary work[1], with certain restrictions.[2]   He then concluded that Plaintiff was unable to perform any past relevant work, and that prior to July 24, 2007, before he turned 50 years of age, there were other jobs in the national economy that Plaintiff could have performed, such as small production machine operator, small product assembler, and food order clerk. (Tr. 29).  He further concluded that beginning on July 24, 2007, when Plaintiff turned 50 years of age, there were not a significant number of jobs in the national economy that Plaintiff could perform.  (Tr. 29). Accordingly, the ALJ concluded that prior to July 24, 2007, Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy, but that beginning on the date his age category changed, a finding of "disabled" would be reached by direct application of Medical-Vocational Rule 201.14.  (Tr. 29).

**Evidence Presented**

Plaintiff was born in 1957, completed the 9th grade, and thereafter received his GED. Plaintiff was a commercial truck driver from 1984 to 1999, and in 1999, he was involved in a wreck in Mississippi while driving his truck, when a drunk driver hit the left front wheel of his

---

[1]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles, like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §416.967(a).

[2]The ALJ listed the restrictions as follows: He can occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.  He can sit for six hours (two hours without interruption) and stand/walk for two hours (one hour without interruption).  The claimant is able to frequently reach overhead with the dominant upper extremity and occasionally reach overhead with the non-dominant upper extremity; bilaterally he can frequently reach in all other directions and can frequently handle, finger, feel, and operate hand and foot controls.  He can frequently climb and balance, occasionally kneel, crouch, and crawl and less than occasionally stoop.  The claimant can occasionally tolerate unprotected heights, moving machinery, operate a moving vehicle, humidity, pulmonary irritants, temperature extremes, and vibrations.  He is mildly limited in the ability to understand, remember, and carry out simple instructions and in the ability to interact with supervisors and co-workers.  He is moderately limited in the ability to understand, remember, and carry out complex instructions and in the ability to interact with the public.  Mildly limited means there is a slight limitation but the person performs generally well.  Moderately limited means there is more than a slight limitation but the person can still perform in a satisfactory manner.

truck going between 60 and 80 miles per hour.  (Tr. 116, 122).  He stated that he was unable to

get x-rays then, and did not feel like he had any broken bones.  (Tr. 247).  After being off work

for about two months, he went back to driving the truck, but after driving for several months and

bouncing in the truck, his pain got worse and he had to stop work in early 2000.  (Tr. 122).  He

then worked as a cashier at an arcade until the arcade closed.  (Tr. 510).  Thereafter, he did odd

jobs, such as lawn-mowing and performing household repairs, which he had to quit some time

in 2004.  (Tr. 510).

The medical records reflect that Plaintiff sought treatment from the Community Clinic,

a Healthcare Ministry of St. Francis House Northwest Arkansas (Community Clinic), on October

1, 2002, complaining of back, shoulder and neck pain and depression.  (Tr. 259).  He reported

that the pain was from injuries sustained in his truck wreck and that the depression began the

prior two or three weeks.  He was diagnosed with depression with anxiety, back pain and back

spasms.  (Tr. 257).  He continued to seek treatment from the Community Clinic for refills of his

pain medication and Lexapro, which was for his depression.  (Tr. 253).

X-rays of Plaintiff's cervical spine were taken at Northwest Medical Center on January

16, 2003 and the findings were:

> Generalized degenerative osteoarthritis with decreased posterior intervertebral distance
> at C3-4, C5-6, and C6-7.  Decreased right intervertebral foramina at C4-5, C5-6 and C6-7
> and minimal encroachment of the left intervertebral foramina at C5-6.

(Tr. 213).

Plaintiff was seen by Dr. Carl M. Kendrick at the Ozark Orthopaedic & Sports Medicine

Clinic, Ltd., and in a letter dated June 9, 2004, to the Community Clinic, Dr. Kendrick advised

that Plaintiff had very minimal arthritic change in the upper cervical spine, but was otherwise

-4-

normal.  He stated that Plaintiff was not having any disk symptoms and that he thought Plaintiff

had other problems that were superimposed upon this.  (Tr. 271).  Dr. Kendrick put Plaintiff on

some exercises and told him what he needed to do as far as his neck was concerned.  He was at

a loss to explain all the complaints of pain, and could not substantiate it with any objective

evidence, concluding, "I think there may be some other problems."  (Tr. 271).

On January 10, 2006, Plaintiff was living by himself in a house that was owned by his

sister and located in a very rural area.  The house was heated by wood and his brother paid for

the electricity.  At that time, he was taking Celebrex, Prevacid and Lexapro.  (Tr. 517-518).  The

Celebrex did not completely take care of the pain, but the Lexapro helped his depression.

Plaintiff stated that the pain was so bad at times that he could not move without it hurting.  (Tr.

519).  He stated that he did not have any days without pain, and that cutting wood to heat his

home made his arthritis worse.  (Tr. 533).  Plaintiff's mother testified at the 2006 hearing that

sometimes Plaintiff was in bed most of the day because he was hurting so badly.  (Tr. 544).

In March of 2006, Plaintiff sought treatment at the Washington Regional Medical Center

for first and second degree burns on his leg and ankle.  (Tr. 316).  Since his home did not have

running water, he had boiled water for his bath, and while pouring it into the bathtub, he spilled

it on his lower extremities.  (Tr. 316).  His wounds were monitored and treated for several days

thereafter.  (Tr. 312-411).

On May 22, 2006, Martin T. Faitak, Ph.D., a clinical psychologist, conducted a

consultative Psychological Evaluation of Plaintiff.  (Tr. 286-291).  Dr. Faitak noted that Plaintiff

had difficulty rising from a seated position and walked to the office with a severe limp,

grimacing as if in pain.  He found Plaintiff to have a Full Scale IQ of 87 - low average range of

AO72A
(Rev. 8/82)

intellectual functioning.  Dr. Faitak recommended that Plaintiff obtain consistent and stable medical care in order to improve his physical situation as much as possible.  (Tr. 289).  Dr. Faitak concluded that Plaintiff had a slight restriction in  understanding and remembering short, simple instructions, and a slight restriction in carrying out short, simple instructions.  He found Plaintiff to have a moderate restriction in understanding and remembering detailed instructions, carrying out detailed instructions, and in the ability to make judgments on simple work-related decisions.  Dr. Faitak also found that Plaintiff had slight restriction in interacting appropriately with the public, supervisors, and co-workers, and was moderately restricted in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting. He reported that Plaintiff may react to stress with depression and increased physical problems. Plaintiff's walking was also affected, in that he could not stand for long. (Tr. 290-291).

On August 1, 2006, Plaintiff was seen by Dr. Robert C. Thompson at Complete Orthopaedics & Sports Medicine Center.  (Tr. 292).  Dr. Thompson found Plaintiff to have slightly reduced motion of the cervical spine, widespread osteoarthritis of the cervical spine and mild arthritic changes of the left shoulder.  (Tr. 293).  He also found that Plaintiff's range of motion of the lumbar spine, upper extremities and lower extremities was normal, and sensation was intact throughout.   He found that x-rays taken in the office demonstrated advanced multilevel degenerative changes that were severe in the cervical spine and that the left shoulder films were essentially normal.  (Tr. 292).

Plaintiff's attorney sent Dr. Faitak another form to complete on October of 2006, entitled "Mental Medical Source Statement." (Tr. 25).  In that form, although Dr. Faitak did not examine Plaintiff again, Dr. Faitak found Plaintiff to have **marked limitation** in his ability:

> to maintain attention and concentration for a two hour segment;
> to complete a normal workday and workweek without interruptions from psychologically based symptoms;
> to perform at a consistent pace without an unreasonable number and length of rest periods;
> to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
> to travel in unfamiliar places;
> to use public transportation;
> to set realistic goals or make plans independently of others; and
> to deal with normal work stresses.

(Tr. 297-299)(emphasis added). Dr. Faitak also referred to his full evaluation report dated May 22, 2006, and stated that Plaintiff had problems with concentration, thinking speed, energy level, strength and social comfort, based on test data. (Tr. 300).

On November 20, 2007, Dr. Alice M. Martinson, from the Orthopaedic & Sports Medicine Clinic of Northwest Arkansas, wrote a letter to the Social Security Administration. (Tr. 301-303). At that time, Plaintiff was taking Celebrex, Lexapro, Prevacid, Ultram, Flexeril and Darvocet. Dr. Martinson noted that on physical examination, Plaintiff appeared much older than his stated age, had a generally stooped round-shouldered posture which he could not actively reverse, and walked with a slow, somewhat shuffling gait. (Tr. 302). She stated that cervical spine films showed multi-level degenerative disc changes, characterized by endplate sclerosis and narrowing of the disc spaces, and that x-rays of the lumbar spine showed mild multi-level degenerative disc disease. She also found that the x-ray of the left shoulder showed some narrowing of the acromioclavicular joint, but no substantial spurring or disruption of the coracoacromial ligaments. (Tr. 302). Dr. Martinson concluded:

> He appears to be chronically ill. ...I therefore most strongly urge that he undergo neurologic evaluation and consideration be given to some laboratory studies to identify the cause of his neurologic abnormalities. There is no question in my mind that he has

-7-

a significant non-musculoskeletal diagnosis underlying his dysfunction.
. . .
I would again emphasize that he most likely has some form of chronic illness outside the
musculo-skeletal[sic] system, which is playing a substantial role in his current clinical
picture.

(Tr. 302-303).  In her Medical Source Statement of Ability to do Work-Related Activities

(Physical) dated November 20, 2007, Dr. Martinson listed many activities that Plaintiff would

be able to perform.  (Tr. 304-309).[3]

A Mental Diagnostic Evaluation was performed on April 10, 2008, by Cara R. Hartfield,

Ph.D. from the Northwest Arkansas Psychological Group.  (Tr. 487-493).  In her evaluation, Dr.

Hartfield noted that Plaintiff was then living with his mother and brother.  (Tr. 488).  She

diagnosed Plaintiff with:

> Axis I: Major Depressive Disorder, Single Episode, Moderate;
> Axis II: No diagnosis
> Axis V: 50

(Tr. 491).  Dr. Hartfield noted that Plaintiff's level of intellectual functioning was estimated to

be in the low average range and that there were moderate problems with concentration.  She then

stated that Plaintiff's pace was slowed and that he took a long time on Serial 3's and paused for

long periods of time on the arithmetic problems, concluding that "[t]his indicates a **markedly**

slow processing speed." (Tr. 493)(emphasis added).  In her Medical Source Statement of Ability

to do Work-Related Activities (Mental), dated April 21, 2008, Dr. Hartfield found, <u>inter alia</u>, that

---

[3]Dr. Martinson found Plaintiff could continuously lift up to 10 pounds and frequently lift 11 to 20 pounds;
continuously carry up to 10 pounds and occasionally carry 11 to 20 pounds;  sit at one time for 2 hours;  stand and
walk at one time for 1 hour;  sit for a total of 6 hours in an 8 hour work day;  stand and walk for a total of 2 hours in an
8 hour work day;  reach, handle, finger, feel and push/pull frequently with the right hand, and do the same with the left
hand except could only occasionally reach overhead with the left hand;  operate foot controls frequently with both feet;
frequently climb stairs and ramps, ladders or scaffolds and balance;  never stoop;  and occasionally kneel, crouch, and
crawl;  occasionally tolerate unprotected heights, moving mechanical parts, operating a motor  vehicle, humidity and
wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat, and vibrations.  (Tr. 304-308).

-8-

Plaintiff had limited activities of daily living and that his lack of participation in household chores and social activities indicated a **marked** limitation in these areas. (Tr. 495)(emphasis added). Plaintiff's attorney subsequently sent Dr. Hartfield another form to complete, entitled "Mental Medical Source Statement,"and in that undated report, Dr. Hartfield found that Plaintiff had a "**Marked** limitation in the ability to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 498-450)(emphasis added).

At the November 7, 2006 hearing, the ALJ presented a hypothetical question to the VE, asking him to assume an individual of Plaintiff's age at onset, which was 44 years old, with a GED and with past relevant work as a commercial truck driver and arcade cashier, could occasionally lift and or carry 10 pounds, frequently less than 10 pounds; could occasionally operate hand controls, occasionally do push/pulling with the hands; and could not do any over head reaching. He also asked the VE to assume some specific mild and moderate psychological limitations. (Tr. 562). The VE responded that such an individual would be limited to sedentary unskilled jobs such as cashier II, bench assembly, production inspectors, checkers, and examiners. (Tr. 563). In his second hypothetical, the ALJ asked the VE to assume the same physical limitations as before, but to reduce the psychological limitations as follows:

> All the following are **marked**, and by that, I mean seriously limited but not precluded: the ability to maintain attention and concentration for a two-hour period, the ability to complete a normal workday and workweek without interruption from psychologically-based symptoms, the ability to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to maintain socially-appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to travel in unfamiliar places, the ability to use public transportation, the ability to set realistic goals or make plans independently of others, the ability to deal with normal work stresses.

(Tr. 565-566)(emphasis added). The VE responded by saying that these limitations would

-9-

preclude the individual from maintaining and performing at a consistent pace enough where one could remain employed, and that such an individual could not function in the national, regional, or state economy. (Tr. 567).

In his December 18, 2006, unfavorable decision, the ALJ found that Plaintiff had the RFC to perform a wide range of sedentary exertion level activities with non-exertional limitations. (Tr. 47). He also found that there were jobs in the national economy that Plaintiff could perform, such as cashier, bench assembler, and product inspector. (Tr. 50).

On May 5, 2007, the Appeals Council ordered the case remanded to the ALJ, stating, in part, that Plaintiff's mental impairment had not been evaluated properly, that further evaluation of Plaintiff's mental status was required, that the opinions of the consultative examiners were not evaluated, and that the VE must state the Plaintiff's specific functional capacities. (Tr. 90-91).

At the hearing held before the ALJ on September 16, 2008, Plaintiff stated that he had to move in with his brother because he could not keep up with things at the rural home any more. (Tr. 578). Plaintiff's mother also testified that Plaintiff had been getting a lot worse and was in more pain. (Tr. 589). She said that he did not sleep well, and at times she would find him sitting in the bathroom on the toilet sound asleep. (Tr. 589).

Prior to the hearing on September16, 2008, the ALJ had presented written interrogatories to the VE, who was also present at the hearing. (Tr. 170-173). In his first written hypothetical, the ALJ asked the VE to assume:

> a hypothetical person 44 years old, with GED education and the same work history as the Plaintiff. This person can occasionally lift/carry 20 pounds and frequently 10 pounds. He can sit for 6 hours, 2 hours without interruption. He can stand/walk for 2 hours, one

-10-

without interruption. With the non-dominant upper extremity he can occasionally reach overhead. With his dominant upper extremity, he can frequently reach overhead. Bilaterally, he can frequently reach in all other directions and can frequently handle, finger, feel, and operate hand and foot controls. He can frequently climb and balance, occasionally kneel, crouch, and crawl, and less than occasionally stoop. He can occasionally tolerate unprotected heights, moving machinery, operating a moving vehicle, humidity, pulmonary irritants, temperature extremes and vibrations. He is mildly limited in the ability to understand, remember, and carry out simple instructions and in the ability to interact with supervisors and co-workers. He is moderately limited in the ability to understand, remember, and carry out complex instructions and in the ability to interact with the public. Mildly limited means there is a slight limitation but the person performs generally well. Moderately limited means there is more than a slight limitation but the person can still perform in a satisfactory manner. Assume there is no past relevant work to which the person can return and that transferable skills are not an issue. Are there jobs in the national and regional economy this person can do? If so, please list examples, three if possible, along with DOT identification, and relevant numbers in the state and national economies.

The VE responded with three jobs that Plaintiff would be able to perform: small production machine operator; small product assembler; and food order clerk. (Tr. 172). In his second written hypothetical to the VE, the ALJ instructed the VE to change the limitations as follows:

The physical limitations in the first hypothetical question continue to apply. Reduce the ability to respond to usual work situations and routine work situations to a **marked** limitation. Markedly limited means there is a serious limitation that results in a substantial loss of ability. With these limitations, would there be jobs? If so, please give examples, three if possible, and relevant numbers.

(Tr. 173)(emphasis added). The VE responded that there would be no jobs. (Tr. 173).

At the hearing held on September 16, 2008, the VE testified that if Plaintiff was markedly limited in responding appropriately to supervisors, co-workers, and the public, all jobs would be eliminated. (Tr. 601). The VE was then asked whether there would be any jobs if the ability to perform at a consistent pace without an unreasonable number and length of rest periods was a marked limitation, to which the VE confirmed that all jobs would be eliminated. (Tr. 604).

-11-

**Discussion**

With regard to Plaintiff's mental limitations, the ALJ accorded very little weight to the October 2006 assessment of Dr. Faitak, which included eight marked limitations, and the undated assessment of Dr. Hartfield, which included at the least one marked limitation. (Tr. 26-27). With regard to Dr. Faitak's October 2006 assessment, the ALJ noted that it was not based on a recent examination of the Plaintiff, but on his previous examination of the Plaintiff in May 2006. The ALJ found, "While parts of the October 2006, assessment are consistent with the prior examination report and opinion, the findings indicating 'marked limitations' are not supported by the test results as described by Dr. Faitak nor are they consistent with his observations at the time of the examination nor the longitudinal observations of the claimant's treating physicians at St. Francis clinic." (Tr. 26).

With regard to Dr. Hartfield, the ALJ found inconsistencies between Dr. Hartfield's Medical Source Statement dated April 21, 2008 and the subsequent (undated) one. Specifically the ALJ found:

> Sometime after he received a copy of Dr. Hatfield's[sic] report from the Administrative Law Judge the claimant's attorney sent Dr. Hatfield[sic] another form to complete regarding the claimant's mental abilities entitled "Mental Medical Source Statement." Dr. Hatfield[sic] did not re-examine the claimant and had not seen him since the April 10, 2008, consultative evaluation. On this undated form, completed after the one-time examination, in addition to findings similar to those in the April medical assessment, Dr. Hatfield[sic] indicated that there was marked limitation of the claimant's ability to perform at a consistent pace without an unreasonable number and length of rest periods. "Marked" was defined on the form as "seriously affects ability to perform this basic work function." However, this assessment was not based on a recent examination by Dr. Hatfield[sic] but on her previous, one-time, examination. (Exhibit 17F). While parts of the assessment are consistent with the prior examination report and opinion, the finding indicating "marked limitation" is not supported by her observations as reported at the time of the examination nor those of Dr. Faitak or the longitudinal observations of the claimant's treating physicians at St. Francis Clinic. Therefore, this undated assessment

-12-

by Dr. Hatfield[sic] is accorded very little weight.

(Tr. 27).  The ALJ further found that Dr. Hatfield's[sic] second report was less than credible "because she did no testing whatsoever and based her opinion only on the clinical interview and assessment questions." (Tr. 27).  In addition, he found Dr. Hartfield's assessment was partially based on Plaintiff's slow response to serial threes, but that she did not take into consideration Plaintiff's difficulty with arithmetic as shown in the tests done by Dr. Faitak.  (Tr. 27).

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  The Court is of the opinion that, rather than disregard the reports of Dr. Faitak and Dr. Hartfield, the ALJ should have obtained clarification from both Dr. Faitak and Dr. Hartfield regarding Plaintiff's mental limitations.  This is especially true given the fact that these were the only two doctors to assess Plaintiff's mental limitations.  A claimant's RFC is a medical question, and the ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)(noting that the regulations provide that treating physicians or psychologists will be recontacted by the Commissioner when the medical evidence received from them is inadequate to determine a claimant's disability).

With regard to Plaintiff's physical limitations, the ALJ gave great weight to the reports and assessments done by orthopedists Dr. Thompson and Dr. Martinson, and concluded that the RFC assessment was supported by the medical findings noted in the records from the Community Clinic and the opinions of Dr. Thompson and Dr. Martinson.  (Tr. 28).  However, the ALJ failed to acknowledge Dr. Martinson's strong recommendation that Plaintiff undergo

-13-

a neurological exam and that consideration be given to some laboratory studies to identify the cause of his neurologic abnormalities.

**Conclusion**

The Court is of the opinion that the present case should be remanded to the ALJ to more fully develop the record with respect to Plaintiff's mental and physical limitations.  More specifically, the Court remands this matter to the ALJ, with instructions to obtain clarification from Dr. Faitak and Dr. Hartfield regarding Plaintiff's mental limitations, and to also obtain a report and Physical RFC Assessment from a neurologist, who should perform a thorough neurological exam of Plaintiff.

Based upon the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

IT IS SO ORDERED this 6th day of May, 2010.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-14-